IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 09-cv-02713-WYD-BNB

ROSS ALLEY,

Plaintiff,

v.

BEVERLY DOWIS,
DR. J.G. FORTUNATO, and
DR. PAULA FRANZ,

Defendants.

_____

### RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

_____

This matter arises on **Defendants' Motion for Summary Judgment** [Doc. #47, filed 10/08/2010] (the "Motion") and **Defendants' Memorandum Brief in Support of Motion for Summary Judgment** [Doc. #48] (the "Brief").  I respectfully RECOMMEND that the Motion be GRANTED.

### I.  STANDARD OF REVIEW

The plaintiff is proceeding *pro se*, and I must liberally construe his pleadings.  Haines v. Kerner, 404 U.S. 519, 520-21 (1972).  I cannot act as advocate for a *pro se* litigant, however, who must comply with the fundamental requirements of the Federal Rules of Civil Procedure. Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991).

In ruling on a motion for summary judgment, the facts must be viewed in the light most favorable to the party opposing the motion and that party must be afforded the benefit of all reasonable inferences to be drawn from the evidence.  Adickes v. S. H. Kress & Co., 398 U.S.

144, 157 (1970).  Rule 56(c), Fed. R. Civ. P., provides that summary judgment should be rendered "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating by reference to portions of pleadings, discovery and disclosure materials on file, and any affidavits, the absence of genuine issues of material fact.  Celotex Corp. v. Catrett, 447 U.S. 317, 323 (1986).  "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial."  Trainor v. Apollo Metal Specialties, Inc., 318 F.3d 976, 979 (10th Cir. 2002).

The party opposing the motion is then required to go beyond the pleadings and designate evidence of specific facts showing that there is a genuine issue for trial.  Celotex, 447 U.S. at 324.  Only admissible evidence may be considered when ruling on a motion for summary judgment.  World of Sleep, Inc. v. La-Z-Boy Chair Co., 756 F.2d 1467, 1474 (10th Cir. 1985).

## II.   UNDISPUTED MATERIAL FACTS[1]

1.   The plaintiff is currently incarcerated by the Colorado Department of Corrections ("DOC").  At all times pertinent to this action, he was housed at the Sterling Correctional Facility ("SCF").  *Brief*, Ex. 1.

2.   The plaintiff's estimated mandatory release date ("MRD") is in 2068.  Id.

3.   Defendant Paula Frantz, M.D., is the Chief Medical Officer for the DOC.  Id. at Ex. 2, ¶ 2.

4.   Defendant Beverly Dowis is the Health Services Administrator at SCF.  Id. at Ex. 3, ¶ 3.

5.   Defendant Joseph Fortunato, M.D., is a physician at SCF.  Id. at Ex. 4, ¶ 3.

6.   On January 7, 2010, the plaintiff filed an Amended Prisoner Complaint [Doc. #9] (the "Complaint") alleging deliberate indifference regarding the denial of knee replacement surgery; the decision to not provide him with hearing aids; and his treatment for Hepatitis C.  Id. at Ex. 2, ¶ 7; *Complaint*, [Doc. # 9].

### A.   Facts Regarding Denial of Knee Replacement Surgery

7.   On January 28, 2008, the plaintiff was seen for an orthopedic consultation by Dr. Fenton, who noted that the plaintiff qualified as a candidate for total knee replacement and that "[m]inimally supportive care would be wheelchair use and limited cane use."  *Brief*, Ex. 2, ¶ 8; Ex. 6.

---

[1]The plaintiff was ordered to respond to the Motion on or before November 8, 2010 [Doc. #50].  He did not file a response.  Therefore, to the extent the defendants' factual statements are supported by evidence, the facts are undisputed.

8.   On February 22, 2008, Brian Webster, a Physician's Assistant at SCF, charted that the plaintiff would be placed in a wheelchair pending knee replacement surgery.  Id. at Ex. 2, ¶ 9; Ex. 7.  The plaintiff received a wheelchair the same day.  Id. at Ex. 2, ¶ 9; Ex. 8.

9.   On June 16, 2008, the plaintiff was brought to the clinic for evaluation of injuries to his ankle and forearm.  Initially, the plaintiff claimed he injured himself falling from his bunk.  Id. at Ex. 2, ¶ 10; Ex. 9.

10.   On June 18, 2008, the plaintiff was evaluated by P.A. Webster for his ankle injuries and was found to have a fracture of the fibula.  Webster requested an orthopedic consult.  Id. at Ex. 2, ¶ 11; Ex. 10.

11.   On June 20, 2008, the plaintiff underwent surgical repair of the tibia and fibula.  The orthopedic surgeon's operative note stated that the plaintiff was injured from an altercation with his cell mate.  Id. at Ex. 2, ¶¶ 10-11; Ex. 11.

12.   On June 21, 2008, the orthopedic surgeon discharged the plaintiff from the hospital noting that the reason for performing the surgical repair of the fractured tibia and fibula was because "[i]t was felt that it was more imperative that he get a good result so that he could ambulate and not be wheelchair bound."  Id. at Ex. 2, ¶ 12; Ex. 12.

13.   On August 13, 2008, the plaintiff was evaluated in the SCF clinic for complaints of continuing pain in his fractured ankle.  The clinic staff contacted the orthopedic surgeon who recommended cutting a window in the cast over the malleolus to relieve pressure from the cast.  Id. at Ex. 2, ¶ 13; Ex. 13.

14.   On August 19, 2008, the plaintiff continued to complain of pain.  The clinic staff noted that the plaintiff had removed his cast by himself.  Staff contacted the orthopedic surgeon's office.  <u>Id.</u> at Ex. 2, ¶ 14; Ex. 14.

15.   On August 23, 2008, the plaintiff underwent surgery to remove the hardware that was used to repair his fractured ankle because the hardware had become infected.  <u>Id.</u> at Ex. 2, ¶ 14; Ex. 15.

16.   On October 5, 2008, the plaintiff returned his knee brace, ankle brace, and surgical shoe to the clinic and indicated he did not need the items anymore since he was in a wheelchair. <u>Id.</u> at Ex. 2, ¶ 15; Ex. 16.

17.   On January 16, 2009, P.A. Webster charted that the plaintiff was "placed in a wheelchair, 2-22-08, while awaiting a total knee replacement.  In the interim, he was assaulted and experienced an ankle [fracture] . . . requiring multiple surgeries."  Webster further noted that "enough time had lapsed that requesting knee surgery needs to be restarted as well," and he requested an orthopedic consult.  <u>Id.</u> at Ex. 2, ¶ 16; Ex. 17; Ex. 18.

18.   On or about February 12, 2009, the Utilization Management Committee ("UMC") reviewed P.A. Webster's request for an orthopedic consult.  <u>Id.</u> at Ex. 2, ¶ 17; Ex. 19.

19.   The UMC is an internal committee comprised of two DOC providers and the manager of the scheduling unit.  The UMC reviews specialty consult requests for medical appropriateness.  <u>Id.</u> at Ex. 2, ¶ 17.

20.   The UMC determined that the orthopedic consult was not medically necessary and instead recommended "getting the inmate out of the wheelchair and trying knee exercises with a knee brace."  <u>Id.</u> at Ex. 18; Ex.19.

21.   Once the UMC makes its decision, it passes on the consult request to Physician Health Partners ("PHP") which is the entity that manages all of the medical specialty contracts. PHP also reviews the consults for appropriateness and either agrees or disagrees with the recommendation of the UMC.  <u>Id.</u> at Ex. 2, ¶ 17.

22.   PHP denied the orthopedic consult as not medically necessary.  <u>Id.</u> at Ex. 2, ¶ 17; Ex. 19.

23.   On May 6, 2009, the plaintiff was seen in the clinic by several medical and prison staff members for a "staffing" based in part on his complaints about his knees.  The staffing record notes that the plaintiff "[c]urrently is not a good surgical candidate" for knee replacement due to his morbid obesity, which increased since starting the use of the wheelchair, and because of deconditioning while being in the wheelchair.  The record further notes that the plaintiff was "made aware that his current health may preclude surgery as his overall health is fair to poor currently and [he] is a surgical risk for MI, Stroke, Embolization, Kidney failure."  <u>Id.</u> at Ex. 2, ¶ 18; Ex. 20.

24.   Dr. Frantz's medical opinion is that the plaintiff is a poor surgical candidate for knee replacement surgery.  Successful knee replacement surgery requires that a patient will be ambulatory and partial weight bearing within days of the surgery.  The patient must do everything possible to maintain muscle strength and tone of the lower extremities in order to facilitate recovery.  The plaintiff's reliance on a wheelchair for the last two years reduces the likelihood that he will recover and rehabilitate following the surgery.  The plaintiff is also a poor surgical candidate because of his morbid obesity and his poor level of conditioning.  <u>Id.</u> at Ex. 2, ¶¶ 19-21.

### B.   Facts Regarding Denial of Hearing Aids

25.   On June 11, 2009, the plaintiff underwent an audiogram following his complaints of decreased hearing.  Id. at Ex. 2, ¶ 22; Ex. 21.

26.   As a result of the audiogram, the audiologist recommended two hearing aids.  Id. at Ex. 2, ¶ 22.

27.   The DOC determined that, under its own criteria, the plaintiff did not qualify for hearing aids.  Id. at Ex. 2, ¶ 23; Ex. 23.

28.   The DOC criteria regarding qualification for hearing aids were developed as a result of the Montez v. Ritter class action lawsuit, and have been approved by the judge presiding over that case.  Id. at Ex. 2, ¶ 23; Ex. 24.

29.   The criteria require that the thresholds for four frequencies will be averaged. Frequencies that are over 40 dB (decibels) will be weighted for the average calculation, thereby increasing the number of offenders who will qualify for hearing aids.  The better ear will determine if a hearing aid will be issued.  If the better ear has an average threshold less than 40 dB, the offender does not qualify for any hearing aids.  If the better ear has an average of 40-49 dB, the offender will qualify for one hearing aid.  If the better ear has an average threshold of 50 dB or greater, the offender will qualify for two hearing aids.  Id. at Ex. 2, ¶ 23.

30.   The plaintiff had a four frequency average threshold of 38 dB in the right ear and 37 dB in the left ear. Thus, he did not qualify for hearing aids under the DOC criteria.  Id. at Ex. 2, ¶ 24; Ex. 21.

### C.   Facts Regarding Hepatitis C Treatment

31.   On January 5, 2009, the plaintiff was evaluated in the clinic by P.A. Webster to discuss the plaintiff's diagnosis of Hepatitis C.  Id. at Ex. 2, ¶ 25; Ex. 25.

32.   On February 8, 2009, the nursing staff evaluated the plaintiff for urinary complaints. The nurse documented that the plaintiff requested interferon treatment for Hepatitis C, but did not want to take drug and alcohol classes.  Id. at Ex. 2, ¶ 26; Ex. 26.

33.   The DOC clinical standard for treatment of Hepatitis C is that all offenders who want to be treated for Hepatitis C must complete six months of drug and alcohol classes. Id. at Ex. 2, ¶ 27; Ex. 27, pp. 10, 44-46, 54.

34.   Hepatitis C is a viral infection that is transmitted by blood and body fluid exposure. It is overwhelmingly associated with intravenous drug abuse.  Because of this association, the DOC treats the substance abuse before starting therapy for Hepatitis C in order to minimize the risk for treatment failure or reinfection.  Id. at Ex. 2, ¶ 27.

35.   On April 13, 2009, Ryder May, R.N., responded to the plaintiff's complaint regarding Hepatitis C treatment and informed him that he was not being denied treatment. Rather, May informed the plaintiff that he first needed to participate in 6 months of drug and alcohol classes just like every other offender seeking treatment for Hepatitis C.  Id. at Ex. 2, ¶ 28; Ex. 28.

36.   The plaintiff filed a Step I grievance demanding that he be treated with interferon. The Step I grievance was denied on April 17, 2009, because he had not participated in the drug and alcohol classes.  Id. at Ex. 29.

8

37.    On May 6, 2009, the plaintiff attended a staffing in the clinic for his continued complaints about his knees and Hepatitis C treatment.  The staffing notes erroneously indicate that the plaintiff was not eligible for drug and alcohol classes because he had more than 5 years remaining on his sentence.  Id. at Ex. 2, ¶ 29; Ex. 30.  The clinical standard for treatment of Hepatitis C waives the requirement that an offender be five years from his mandatory release date before he can attend drug and alcohol classes.  Id. at Ex. 2, ¶ 29.

38.    On May 13, 2009, the plaintiff's Step II grievance regarding Hepatitis C treatment was denied because of his failure to attend drug and alcohol classes.  Id. at Ex. 31.

39.    On May 21, 2009, Ryder May, R.N., wrote the plaintiff and again informed him that he was "not being singled out in any way," and that "[a]ll offenders are required to be enrolled for at least 6 months in a Drug & Alcohol program" prior to treatment for Hepatitis C.  Id. at Ex. 32.

40.    On July 15, 2009, the plaintiff attended another staffing in the medical clinic.  The staffing documentation states that the plaintiff brought up Hepatitis C treatment but that he had not taken drug and alcohol classes yet.  The plaintiff was again erroneously told that he was not eligible for the classes until he had less than five years left on his sentence.  The plaintiff became verbally aggressive during the staffing and was asked to leave.  Id. at Ex. 33.

41.    The plaintiff filed a Step III grievance based on denial of Hepatitis C treatment due to his failure to attend drug and alcohol classes.  The Step III grievance officer, Anthony DeCesaro, consulted with Dr. Frantz prior to responding to this grievance.  Dr. Frantz advised DeCesaro that there was no medical reason to override the clinical standard regarding the requirement for drug and alcohol treatment.  She also informed him that SCF staff were in error

when they charted that the plaintiff had to be less than five years from his mandatory release date before he could take drug and alcohol classes and that the clinical standard waives this requirement so that an offender with Hepatitis C can be accepted into drug and alcohol classes regardless of discharge date.  Id. at Ex. 2, ¶ 31.

42.   On August 6, 2009, DeCesaro responded to the plaintiff's Step III grievance.  Id. at Ex. 34.  He stated:

> In review of this matter, I have contacted the SCF Clinical Services staff and was informed that due to your PED, you were determined not to be eligible to participate in Drug and Alcohol classes, and because you have not participated in Drug and Alcohol classes, were not eligible to receive interferon treatment of your HEP C medical condition.  However, the Drug and Alcohol treatment criteria is being waived at this time to allow Clinical Services to begin the HEP C assessment process to determine your treatment.  You will also receive an assessment for Drug and Alcohol treatment and will be placed on a wait list for participation in the next available class.

43.   After DeCesaro's response was given to the plaintiff, Beverly Dowis contacted Dr. Frantz because DeCesaro's response seemed to remove the requirement for drug and alcohol classes.  Id. at Ex. 2, ¶ 32; Ex. 3, ¶ 9.

44.   Dr. Frantz contacted DeCesaro and asked about his response.  DeCesaro did not intend to waive the drug and alcohol class requirement, but only the requirement that the plaintiff be less than 5 years from discharge before starting these classes.  DeCesaro also stated that he thought DOC medical should proceed with a liver biopsy, but Dr. Frantz explained to him that while staff could proceed with lab work to begin the process of assessing the plaintiff for Hepatitis C treatment, it would be inappropriate to do a liver biopsy until the plaintiff completed drug and alcohol classes.  Id. at Ex. 2, ¶ 33.

10

45.   A liver biopsy is important in determining if treatment is advised and needs to be completed as close as possible to the beginning of medical therapy for Hepatitis C.  Id. at Ex. 2, ¶ 33.

46.   On September 16, 2009, Dr. Fortunato saw the plaintiff in clinic for the first and only time.  Id. at Ex. 4, ¶ 12.  On that date, Dr. Fortunato charted that "it appears [the plaintiff] will participate in the Hep C [treatment] program if he is suited per cardiac, hematologically, thyroid, liver, etc.  Per Bev Dowis we will begin lab work etc as his prequalification begins.  As I understand he will forgo drug and alcohol, but this will be discussed further per Ms. Dowis."  Id. at Ex. 35.

47.   On September 17, 2009, DeCesaro sent the plaintiff a letter attempting to clarify his previous response to the Step III grievance.  Id. at Ex. 2, ¶ 33; Ex. 37.

48.   On November 12, 2009, a staffing was held because of the plaintiff's complaints about interferon treatment.  Staff charted that "[u]pon research of his wanting Hep C treatment it was found that [the plaintiff] must attend the therapeutic community program because of his [drug and alcohol] code.  His MRD and PED date was waived.  [The plaintiff] has submitted a letter to the Clinical Services stating that he would not attend the [therapeutic community] program.  Will have refusal papers signed for the [Therapeutic Community] program at next staffing with [the plaintiff]."  Id. at Ex. 38.

49.   Another staffing was held on December 9, 2009, as a follow-up to the November 12, 2009 staffing.  The plaintiff claimed that the Step III grievance officer stated that the drug and alcohol classes requirement would be waived.  The plaintiff was informed that staff "would be getting back with him," and he agreed to give his case manager a copy of the Step III grievance.

The plaintiff's case manager was also informed to tell the plaintiff that he should be hearing from medical soon on the next step of applying for treatment.  Id. at Ex. 2, ¶ 35; Ex. 39.

50.   On January 28, 2010, the plaintiff was again staffed in the clinic regarding Hepatitis C treatment.  DeCesaro was present at the staffing and he explained to the plaintiff that at no point was he intending to waive the requirement for drug and alcohol classes.  Rather, he was waiving the requirement that the plaintiff be within 5 years of discharge before he could take drug and alcohol classes so that the plaintiff could attend and get treatment for Hepatitis C.  Id. at Ex. 2, ¶ 36; Ex. 40.

51.   Although the standard is six months of drug and alcohol classes, the plaintiff was told he could attend three months of Alcoholics Anonymous (AA) meetings in lieu of three months of formal treatment in a structured program.  Id. at Ex. 3, ¶ 7; Ex. 40.

52.   The plaintiff was also offered a place in the therapeutic community program to meet his requirement for drug and alcohol classes.  Id. at Ex. 2, ¶ 35; Ex. 3, ¶ 8; Ex. 40.

53.   Participation in the therapeutic community would have required changing the plaintiff's classification from medium to minimum in order for him to attend, but the plaintiff refused to participate.  Id. at Ex. 3, ¶ 8; Ex. 40.

54.   Plaintiff became angry and belligerent during the January 28, 2010, staffing; told staff to "shut the hell up"; and left the staffing.  Id. at Ex. 2, ¶ 36; Ex. 3, ¶ 8; Ex. 40; Ex. 41.

55.   On January 28, 2010, DeCesaro sent another letter to the plaintiff attempting to clarify the Step III grievance response and encouraging him to begin drug and alcohol classes so that he would qualify for Hepatitis C treatment.  Id. at Ex. 42.

56. On January 29, 2010, the plaintiff was again offered a place in the therapeutic community drug and alcohol treatment program, and he again refused. Id. at Ex. 2, ¶ 37; Ex. 3, ¶ 8; Ex. 43.

57. To date, the plaintiff has not started drug and alcohol classes as a necessary prerequisite to Hepatitis C treatment. Id. at Ex. 2, ¶ 37.

58. The treatment for Hepatitis C is never started on an emergent basis. Hepatitis C is a disease that is frequently asymptomatic in most patients. Hepatitis C is typically slowly progressive over the course of decades, and most people who have Hepatitis C will die of something other than the complications of the Hepatitis C infection. The treatment of liver disease is not benign and even in the best of studies it is effective in only 42-52% of cases with genotype 1a, which is the plaintiff's genotype. Id. at Ex. 2, ¶ 38.

### III.  ANALYSIS

The plaintiff brings this action under 42 U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State, . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

The Complaint is not a model of clarity, and the plaintiff's three claims overlap. Claim One alleges that defendant Franz was deliberately indifferent to the plaintiff's medical needs when she denied him treatment for his Hepatitis C. Claim Two alleges deliberate indifference based on defendants Dowis and Fortunato's failure to provide hearing aids, knee replacement surgery and, Hepatitis C treatment. Claim Three alleges that defendants Dowis, Fortunato, and

Franz have conspired to deny the plaintiff his Eight Amendment rights to a knee replacement, hearing aids, and Hepatitis C treatment.

A prison official's deliberate indifference to an inmate's serious medical needs violates the inmate's Eighth Amendment right to be free from cruel and unusual punishment.  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care."  Id. at 104-05.  To establish a claim for deliberate indifference, a plaintiff must prove both an objective component and a subjective component.

The objective component is met if the inmate's medical need is sufficiently serious.  Farmer v. Brennan, 511 U.S. 825, 834 (1994).  A medical need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir.1999) (quoting Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980)).   The subjective component to a deliberate indifference claim is met if a prison official "knows of and disregards an excessive risk to inmate health or safety."  Farmer, 511 U.S. at 837.  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id.

### A.  Knee Replacement Surgery

The record demonstrates that the plaintiff's knee condition was sufficiently serious to meet the objective component because he qualified as a candidate for a total knee replacement. However, the record does not show that any of the defendants were deliberately indifferent to his knee condition.  To the contrary, P.A. Webster issued the plaintiff a wheelchair shortly after the

14

orthopedic doctor recommended a knee replacement.  After that, it was the plaintiff's intervening

ankle surgery, immobility, and weight gain that precluded the knee surgery, not any deliberate

indifference by the defendants.  It is undisputed that in order for knee replacement surgery to be

successful, a patient must within days of surgery be ambulatory and capable of partial weight

bearing; the patient must do everything possible to maintain the muscle strength and the tone of

the lower extremities in order to facilitate recovery; the plaintiff's reliance on a wheelchair for

the previous two years reduced the likelihood that he will recover and rehabilitate following

surgery; the plaintiff is a poor surgical candidate because of his morbid obesity and his poor

level of conditioning; and, in his present condition, the plaintiff is a surgical risk for myocardial

infarction, stroke, embolism, and kidney failure.  On the record before me, *approval* of the knee

replacement surgery would more likely have been deliberately indifferent.  While the plaintiff

may disagree, "a prisoner who merely disagrees with a . . . prescribed course of treatment does

not state a constitutional violation."  Perkins v. Kansas Dept. of Corrections, 165 F.3d 803, 811

(10th Cir. 1999).  The Motion should be granted to the extent it seeks summary judgment in favor

of the defendants on plaintiffs' claims regarding knee replacement surgery.

## B.  Hearing Aids

The plaintiff has not created a material fact dispute regarding whether his hearing deficit

is sufficiently serious to meet the objective prong, nor has he shown that the defendants

subjectively knew of and disregarded an excessive risk to his health.  The record instead

demonstrates only that an audiologist recommended that the plaintiff receive two hearing aids

and that the plaintiff does not meet the DOC's criteria for receiving hearing aids.  There is no

evidence regarding the seriousness of the plaintiff's hearing deficit or the effect it had on the

plaintiff.  Nor is there any evidence that any of the defendants were aware of and disregarded a substantial risk of serious harm to the plaintiff caused by denial of the hearing aids.  The fact that the plaintiff might benefit from hearing aids, without more, is not sufficient to demonstrate that the defendants violated the plaintiff's Eighth Amendment rights.  The Motion should be granted as to the plaintiff's claims regarding denial of hearing aids.

### C.   Hepatitis C Treatment

The plaintiff has not provided any evidence or argument to create a material fact dispute that his Hepatitis C is sufficiently serious--diagnosed by a physician as mandating treatment or so obvious that even a lay person would recognize the need for treatment--as to meet the objective prong of deliberate indifference.  There is no evidence that the plaintiff is suffering from any symptoms related to Hepatitis C.  Nor is there any evidence regarding the length of time the plaintiff has been diagnosed with Hepatitis C or how much, if any, the disease has progressed.  The record simply does not contain any evidence to show that the plaintiff is suffering from a disease that needs prompt treatment.  To the contrary, it is undisputed that Hepatitis C is frequently asymptomatic in most patients; is typically slowly progressive over the course of decades; and that treatment of Hepatitis C is effective in only 42-52% of cases in patients of the plaintiff's genotype.

The record also fails to show that the defendants subjectively knew of and disregarded an excessive risk to the plaintiff's health.  Instead, the record demonstrates that the DOC is willing to assess the plaintiff for Hepatitis C treatment; substance abuse is overwhelmingly associated with contraction of Hepatitis C; all inmates who desire Hepatitis C treatment must complete six months of drug and alcohol classes prior to starting Hepatitis C therapy; and drug and alcohol

16

education are necessary to minimize the risk for treatment failure or reinfection.  However, the

plaintiff will not cooperate by participating in the prerequisite educational classes.  Thus, the

plaintiff is responsible for his lack of Hepatitis C treatment.  The Motion should be granted

insofar as it seeks summary judgment in favor of the defendants on his claims regarding

Hepatitis C treatment.

### D.  Conspiracy

In order to succeed on his conspiracy claim, the plaintiff must prove both the existence of

a conspiracy and the deprivation of a constitutional right.  Dixon v. City of Lawton, 898 F.2d

1443, 1449 n.6 (10th Cir. 1990).  Because the plaintiff has failed to establish the existence of any

constitutional violations, his conspiracy claim must fail.

### IV.  CONCLUSION

The plaintiff's claims lack any merit.  Accordingly, I respectfully RECOMMEND that

the Motion [Doc. #47] be GRANTED and that summary judgment enter in favor of the

defendants on all of the plaintiff's claims against them.  I further RECOMMEND that this action

count as a "prior occasion" for purposes of 28 U.S.C. § 1915(g) based on the frivolous nature of

the claims pursued.

FURTHER, IT IS ORDERED that pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ.

P. 72(b), the parties have 14 days after service of this recommendation to serve and file specific,

written objections.  A party's failure to serve and file specific, written objections waives de novo

review of the recommendation by the district judge, Fed. R. Civ. P. 72(b); Thomas v. Arn, 474

U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions.

In re Key Energy Resources Inc., 230 F.3d 1197, 1199-1200 (10th Cir. 2000).  A party's

objections to this recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review.  <u>United States v. One Parcel of Real Property</u>, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated May 2, 2011.

BY THE COURT:

 s/ Boyd N. Boland                           
United States Magistrate Judge